The Honorable Tim Wooldridge State Senator Post Office Box 339 Paragould, AR 72451
Dear Senator Wooldridge:
I am writing in response to your request, posed on behalf of the Senate and House Interim Committees on Revenue and Taxation, for my expedited opinion on two questions arising from the following reported facts:
 This request involves § 1(b), § 1(c) and § 1(d) of Amendment 79 to the Arkansas Constitution and Ark. Code Ann. § 26-26-1120. Ark. Const. amend. 79, § 1(b) provides that the assessed value of parcels that are not a taxpayer's homestead are subject to a 10% annual cap on the increase in assessed value following a reappraisal. Ark. Const. amend. 79, § 1(c) provides that the assessed value of the parcel used as a taxpayer's homestead is subject to a 5% annual cap on the increase in assessed value following a reappraisal. Ark. Const. amend. 79, § 1(d) states that for taxation purposes the assessed value of homesteads owned by the disabled and individuals over the age of 65 cannot be increased.
 Ark. Code Ann. § 26-26-1120(b) provides that when a disabled person or a person 65 years of age or older sells the homestead, the purchaser is not entitled to any reduction in the property's assessed value. The next tax year following the date of sale the property will be assessed at its full market value, and the assessment limitations in Ark. Const. amend. 79 do not apply.
 Certain county assessors have requested that legislation be considered to remove all caps on assessed value when property is sold or changes use. They propose that on January 1 following the transfer of property, the taxable value of the property would increase to its full assessed value and not be subject to the 5% or 10% annual cap on the increase in assessed value.
Against this backdrop, you have posed the following questions:
 1. Do the 10% cap and 5% cap provided for in Ark. Const. amend. 79, § 1(b) and (c) apply until the reappraised value of the parcel is reached, regardless of the number of times the parcel is sold?
 2. If the answer to question 1 is no, may the General Assembly enact legislation allowing the taxable value of the parcel to increase to full assessed value on January 1 following the transfer or sale of the property?
RESPONSE
I cannot answer your first question with a "yes" or "no." The provisions of Amendment 79 are ambiguous with respect to the question of whether the conveyance of property subject to either of the referenced caps would warrant lifting the cap on the purchaser's assessments until, possibly, the next reappraisal warrants reimposing a cap. With respect to your second question, assuming a court would agree with my conclusion that Amendment 79 is ambiguous on this issue, the court would attach some weight to a legislative conclusion that the constitution supports, even if it may not necessarily mandate, lifting the cap when property changes hands pending the next reappraisal. However, given the ambiguity in Amendment 79, I cannot opine unequivocally that a reviewing court would uphold the constitutionality of the proposed legislation.
Question 1: Do the 10% cap and 5% cap provided for in Ark. Const. amend.79, § 1(b) and (c) apply until the reappraised value of the parcel isreached, regardless of the number of times the parcel is sold?
In my opinion, the answer to this question is unclear. I cannot determine from considering either the text or the historical context of Amendment 79 whether the voters intended (1) that the 10% or 5% annual limit on an increase in assessments applies only to an individual who owned the subject property at the time of the reappraisal that prompted the cap, meaning that the cap would be lifted upon any conveyance of the property until the next reappraisal; or (2) that irrespective of any conveyance of the property in between reappraisals, depending upon the current classification of the property (i.e., either homestead or non-homestead), the appropriate cap will apply until the next reappraisal.
Section 1 of Ark. Const. amend. 79 provides in pertinent part:
 (a) After each county-wide reappraisal, as defined by law, and the resulting assessed value of property for ad valorum [sic] tax purposes and after each Tax Division appraisal and the resulting assessed value of utility and carrier real property for ad valorem tax purposes, the county assessor, or other official or officials designated by law, shall compare the assessed value of each parcel of real property reappraised or reassessed to the prior year's assessed value. If the assessed value of the parcel increased, then the assessed value of the parcel shall be adjusted pursuant to this section.
 (b)(1) If the parcel is not a taxpayer's homestead used as the taxpayer's principal place of residence, then for the first assessment following reappraisal, any increase in the assessed value of the parcel shall be limited to not more than ten percent (10%) of the assessed value of the parcel for the previous year. In each year thereafter the assessed value shall increase by an additional ten percent (10%) of the assessed value of the parcel for the year prior to the first assessment that resulted from reappraisal but shall not exceed the assessed value determined by the reappraisal prior to adjustment under this subsection. For utility and carrier real property, any annual increase in the assessed value of the parcel shall be limited to not more than ten percent (10%) of the assessed value for the previous year.
 (2) This subsection (b) does not apply to newly discovered real property, new construction, or to substantial improvements to real property.
 (c)(1) Except as provided in subsection (d), if the parcel is a taxpayer's homestead used as the taxpayer's principal place of residence then for the first assessment following reappraisal, any increase in the assessed value of the parcel shall be limited to not more than five percent (5%) of the assessed value of the parcel for the previous year. In each year thereafter the assessed value shall increase by an additional five percent (5%) of the assessed value of the parcel for the year prior to the first assessment that resulted from reappraisal but shall not exceed the assessed value determined by the reappraisal prior to adjustment under this subsection.
 (2) This subsection (c) does not apply to newly discovered real property, new construction, or to substantial improvements to real property.
 (d)(1)(A) A homestead used as the taxpayer's principal place of residence purchased or constructed on or after January 1, 2001 by a disabled person or by a person sixty-five (65) years of age or older shall be assessed thereafter based on the lower of the assessed value as of the date of purchase or construction or a later assessed value.
 (B) When a person becomes disabled or reaches sixty-five (65) years of age on or after January 1, 2001, that person's homestead used as the taxpayer's principal place of residence shall thereafter be assessed based on the lower of the assessed value on the person's sixty-fifth birthday, on the date the person becomes disabled or a later assessed value.
 (C) If a person is disabled or is at least sixty-five (65) years of age and owns a homestead used as the taxpayer's principal place of residence on January 1, 2001, the homestead shall be assessed based on the lower of the assessed value on January 1, 2001 or a later assessed value.
This excerpt from Amendment 79 provides that increases in the assessed value of non-homestead property in any given year, excluding newly discovered real property, new construction or substantial improvements to real property, will be limited to 10% of the assessed value of the property in the year preceding the first post-Amendment 79 reappraisal, and to 5% on a homestead. The amendment further precludes increasing the assessed value of the homesteads of the disabled or persons over the age of 65.
Subsection 26-26-1120(b) of the Arkansas Code (Supp. 2003) provides:
 (b)(1) When a disabled person or a person sixty-five (65) years of age or older sells his or her real property, the purchaser shall not be entitled to claim any reduction to the property's assessed value.
 (2) On or after January 1 of the year following the date of the sale, the county assessor shall assess the property at its full market value, unadjusted for assessment limitations required by Arkansas Constitution, Amendment 79.
This statute lifts the prohibition against increasing the assessment on the homestead of a senior citizen or a disabled person when the individual at issue sells his or her property, directing that the property be assessed at its full market value commencing January 1 of the year following the sale.[1]
Neither Amendment 79 nor the legislature by statute has addressed what effect a sale of property might have on the 10% and 5% caps on annual increases in assessed value for purposes of taxation. The question arises, then, whether one might infer from the text of Amendment 79 what tax consequences should ensue upon a sale of property.
Subsection 1(a) of Amendment 79 initially addresses the issue of adjusting assessments purely with reference to the reappraised value of the parcel, mandating that the formula for adjusting assessments set forth in the rest of section 1 will apply if the assessed value of the parcel increased as a result of the reappraisal. Subsection 1(a) at no point addresses what happens if an individual owner transfers the property to another taxpayer. This subsection only directs that if the reappraisal reflects that the value of the parcel has increased, "the assessed value of the parcel shall be adjusted pursuant to this section." This directive thus leaves open the question of whether a conveyance of ownership might matter in determining what adjustment, if any, will occur.
On the other hand, subsections 1(b)(1) and 1(c)(1), which impose the 10% cap and the 5% cap respectively, both preface their formulas for computing assessed value for purposes of taxation by noting that the test for determining which formula will apply is whether the property is "a taxpayer's homestead." Unfortunately, these subsections fail to specify whether the reference in these sections to "a taxpayer" is specific or generic — i.e., whether "a" means "one" or "a" means "any" in identifying the "taxpayer" entitled to the benefit of the caps on a particular parcel following a reappraisal.[2] If it is the former, the caps might be deemed to apply only so long as the owner of the property at the time of the last preceding reappraisal maintains possession, following which the assessment applied to a purchaser will reflect true market value pending a new reappraisal. If it is the latter, regardless of how often the property changes hands, its assessed value will be determined by applying the applicable cap to the parcel in question.
Unfortunately, the text of Amendment 79 provides little guidance regarding whether the voters intended the specific or the generic reading of the term "a" in referencing the "taxpayer" entitled to a tax benefit between reappraisals.[3] The only arguable textual support for one reading over the other is indirect. In support of the proposition that one should read the term "a" as designating any taxpayer who owns property, whether as a homestead or not, during the period between reappraisals, it may be significant that the listed varieties of property not subject to an annual cap in assessments — namely, newly discovered real property, new construction and substantial improvements to real property — do not include property conveyed following the most recent reappraisal. See Ark. Const. amend. 79, §§ 1(b)(2) and 1(c)(2). Although one might interpret this omission as meaning that conveyed property will be subject to any cap that would have applied if the purchaser had owned the property at the time of the most recent reappraisal, I consider this conclusion far from inevitable. Indeed, this conclusion would appear to beg the question, since one could just as readily conclude, if one reads the term "a" in subsections 1(b)(1) and 1(c)(1) of Amendment 79 as designating "one" rather than "any," that listing conveyed property among property not subject to a cap on assessment increases in subsections 1(b)(2) and 1(c)(2) would be redundant and hence unnecessary.
Amendment 79 at no point mentions a purchase of property as either triggering or foreclosing application of a 10% or a 5% cap.[4] This omission might be offered as support for the conclusion that the only inquiry that matters in any given tax year is the class to which any given piece of property belongs in that year — i.e., homestead or non-homestead. However, one might again characterize any such argument as begging the question, given that if "a" taxpayer is read to mean "one" taxpayer — namely, the owner at the time of the most recent reappraisal — the fact that a sale would result in an assessment at full value might be considered so self-evident as to require no acknowledgment.[5]
Lacking clear guidance from the text of Amendment 79 itself, I am authorized to consider the historical context in which the voters adopted the amendment for evidence of their intent. As the court noted in City ofLittle Rock v. ATT Communications of the Southwest, Inc.,318 Ark. 616, 622, 888 S.W. 2d 290 (1994), it is fully appropriate, in attempting to determine the intention behind a law, to examine the law "historically, as well as the contemporaneous conditions at the time of its enactment, consequences of interpretation, and matters of common knowledge within the limits of this court's jurisdiction. Mears, CountyJudge v. Ark. State Hospital, 265 Ark. 844, 581 S.W.2d 339 (1979); seealso Hot Springs Elec. Light Co., 70 Ark. 300, 67 S.W. 762 [1905]." Unfortunately, however, the historical record provides no guidance regarding the voters' intent on this issue. In my opinion, then, it is unclear whether discontent regarding potential property-tax increases prompted the voters only to spare individual taxpayers who hold their property over time from drastic increases from one reappraisal to the next or whether the voters intended to restrict such increases to parcels of property, irrespective of possible changes in ownership, during the period between reappraisals. Consequently, I am unable to offer a "yes" or "no" answer to your question.
Question 2: If the answer to question 1 is no, may the General Assemblyenact legislation allowing the taxable value of the parcel to increase tofull assessed value on January 1 following the transfer or sale of theproperty?
Although my answer to question 1 was not a clear-cut "no," I will address this question to the extent of exploring the General Assembly's possible authority to resolve through legislation the ambiguity discussed in my response to your previous question.
You indicate in your factual recitation that certain assessors propose enacting legislation that would declare lifted, upon the conveyance of property or change in its use, the restrictions set forth in Amendment 79 limiting annual increases in the assessed value of non-homestead property to 10% and annual increases in the assessed value of homestead property to 5%.[6] In effect, such legislation would extend the principle enacted in A.C.A. § 26-26-1120, declaring that a conveyance of property subject to the 10%- and 5%-increase in assessments, like the conveyance of a homestead by a disabled person or a person over the age of 65, would preclude the purchaser from claiming the seller's or any other preferential tax treatment of the sort described in Amendment 79.
In considering whether or not the legislature might permissibly enact the proposed legislation declaring a limitation on caps, I am guided by various principles of statutory and constitutional construction. First, as noted in Bunch v. State, 344 Ark. 730, 43 S.W.3d 132 (2001):
 Statutes are presumed constitutional, and the burden of proving otherwise is on the challenger of the statute. Ford v. Keith, 338 Ark. 487, 996 S.W.2d 20 (1999); ACW, Inc. v. Weiss, 329 Ark. 302, 947 S.W.2d 770 (1997). If it is possible to construe a statute as constitutional, we must do so. Jones v. State, 333 Ark. 208, 969 S.W.2d 618 (1998). In construing a statute, we will presume that the General Assembly, in enacting it, possessed the full knowledge of the constitutional scope of its powers, full knowledge of prior legislation on the same subject, and full knowledge of judicial decisions under preexisting law. McLeod v. Santa Fe Trail Transp. Co., 205 Ark. 225, 168 S.W.2d 413
(1943). We must also give effect to the legislature's intent, making use of common sense and giving words their usual and ordinary meaning. Kyle v. State, 312 Ark. 274, 849 S.W.2d 935 (1993).
Moreover, the legislature has the absolute power to legislate, unless prohibited from doing so by the constitution, either expressly or by necessary implication. Black v. Cockrill, 239 Ark. 367, 369,389 S.W.2d 881 (1965). It is well settled that the Arkansas Constitution is not a grant, but a limitation of powers; and the legislature may rightfully exercise the power of the people, subject only to restrictions and limitations imposed by the Arkansas or United States Constitution. Wellsv. Purcell, 267 Ark. 456, 592 S.W.2d 100 (1979). However, notwithstanding the foregoing, it is well established that constitutional provisions, including amendments, take precedence over any law passed by the legislature. Gravett v. Villines, 314 Ark. 320, 326, 862 S.W.2d 260
(1993).
In matters relating to constitutional amendments the intent of the people is controlling. Bailey v. Abington, 201 Ark. 1072, 149 S.W.2d 573
[148 S.W.2d 176] (1941). See also, Faubus v. Kinney, 239 Ark. 443,389 S.W.2d 887 (1965). The "primary goal" and "fundamental rule" in the interpretation of constitutional provisions and statutes is to give effect to the intent of the people or legislature, as applicable.Rockefeller v. Hogue, 244 Ark. 1029, 429 S.W.2d 85 (1968). The court has stated that it should constantly keep in mind the object sought to be accomplished by an amendment's adoption, and the evils, if any, sought to be prevented or remedied, and effect should be given to the purpose indicated by a fair interpretation of the language used, and the intent may be shown by implications as well as by express provisions. Bailey,supra at 1078-79.
With respect to the question of what deference, if any, to accord the legislature's interpretation of a constitutional amendment, the Arkansas Supreme Court has observed: "Legislative interpretation of constitutional provisions is never binding on the courts, but, if there is any doubt or ambiguity, it is persuasive and entitled to some consideration." Mears,County Judge v. Hall, 263 Ark. 827, 835, 569 S.W.2d 91(1978), citingGriffin v. Rhoton, 85 Ark. 89, 107 S.W. 380 (1907). However, the court has further declared: "Legislative and/or Executive interpretations are to be given consideration only when the Constitutional provision is ambiguous." Parkin Printing Stationery Co. v. Arkansas Printing andLithograph Co., 234 Ark. 697, 706, 354 S.W.2d 560 (1962).
Although you do not mention A.C.A. § 26-26-1120 in the text of your questions, you imply in your statement of background facts that the legislature's enactment of this statute might support its further enactment of the proposed legislation regarding the lifting of the 10% and the 5% caps upon a conveyance of property. As noted above, A.C.A. §26-26-1120 provides that when a disabled person or an individual over the age of 65 sells his homestead, beginning in the next calendar year, the assessment applied to the purchaser will be based upon the full appraised value of the property without applying any caps. I gather you are inquiring whether this statute, assuming it falls within the legislature's constitutional authority to enact, would support the legislature's further declaring that property subject to a 10% or a 5% cap pursuant to Amendment 79 would likewise be subject to assessment at full market value upon its conveyance.
I am not persuaded that the constitutional issue with respect to A.C.A. § 26-26-1120 is the same as it would be with respect to the legislation proposed in your request. Subsection 1(d) of Amendment 79 clearly deals with a tax advantage that applies only because of the status of thetaxpayer: if he is disabled or over the age of 65, his property taxes may not be increased. It is completely logical to conclude that if that taxpayer conveys the property to someone who does not meet one or both of these criteria, the property will be assessed at its full market value, which is precisely what A.C.A. § 26-26-1120 declares.[7] By contrast, as discussed above, it is unclear whether the caps imposed in subsections 1(b) and 1(c) of Amendment 79 apply only to the taxpayer who owned the property at the time of the most recent reappraisal or whether they apply to any taxpayer who owns the property during the period between reappraisals. Even assuming that A.C.A. § 26-26-1120 would pass constitutional muster if read as applying only to purchasers who are not themselves either disabled or over the age of 65 — an assumption I believe is warranted — it does not necessarily follow that the legislation proposed in your request would likewise pass constitutional muster.
The question remains, then, whether under the principles of statutory and constitutional construction recited above, the General Assembly might constitutionally enact the legislation described in your request. Should the General Assembly choose to do so, it will in effect mean they interpret Amendment 79 as reflecting only the people's impulse to attenuate the "sticker shock" that a homeowner might experience in the year following a reappraisal if he were obliged to pay taxes on the full newly assessed value. This intention would suggest that the term "a taxpayer" refers only to the taxpayer who owns the property at issue at the time of the reappraisal, meaning that any purchaser of the property could be taxed at the full newly assessed value. However, given the ambiguities contained in Amendment 79, including its reference to adjusting the assessed value of "the parcel," I am unable confidently to opine that the people in fact intended this reading. As noted above, the General Assembly has wide discretion to legislate within constitutional parameters; its legislation will be presumed constitutional; and its interpretation of constitutional provisions will be given some weight by a reviewing court when the provisions are ambiguous, as are the pertinent provisions of Amendment 79. Based on these principles, a reviewing court might well reject a constitutional challenge to the proposed legislation. However, I cannot predict without reservation that a court would do so.
Assistant Attorney General Jack Druff prepared the foregoing opinion, which I hereby approve.
Sincerely,
MIKE BEEBE Attorney General
MB:JD/cyh
[1] Although it does not bear directly on your question, I will opine that the quoted provision would survive constitutional challenge with respect to any purchaser who is himself disabled or over the age of 65 only if read as being qualified by subsection 1(d)(1)(A) of Amendment 79, which provides:
 A homestead used as the taxpayer's principal place of residence purchased or constructed on or after January 1, 2001 by a disabled person or by a person sixty-five (65) years of age or older shall be assessed thereafter based on the lower of the assessed value as of the date of purchase or construction or a later assessed value.
(Emphasis added.) It appears clear on the face of this provision that if a person who is disabled or over 65 buys a homestead from a seller who is likewise disabled or over 65, the buyer will be entitled to the same reduction as was the seller. Notwithstanding the statute's silence on this issue, I do not believe that the legislature intended to include such a buyer within the scope of the statute.
[2] In State v. Martin, 60 Ark. 343, 353, 30 S.W. 421 (1895) the court remarked:
 According to Mr. Webster, "a" means one or any, but less "emphatically than either." It may mean one where only one is intended, or it may be any one of a great number. That is the trouble. Of itself, it is in no sense a term of limitation. Mr. Webster also says: "It is placed before nouns of the singular number, denoting an individual object, or quality individualized." Quality is defined as (1) "the condition of being of such a sort as distinguished from others; (2) special or temporary character, profession, occupation."
See Ark. Op. Att'y Gen. No. 90-015 (discussing and applying this definition).
[3] My use of the term "the" in this sentence to modify "taxpayer" tracks the language of Amendment 79, which twice acknowledges that the operative inquiry in determining whether property will be subject to a 10%- or 5%-increase cap is whether the property is "a taxpayer's homestead used as the taxpayer's principal place of residence. . . ." Ark. Const. amend. 79 §§ 1(b)(1) and 1(c)(1). Although I agree with one of my predecessors that the article "the" is one of limitation, specifying only one particular referent, see Ark. Op. Att'y Gen. No. 97-040, I do not believe this conclusion bears on the distinct question of whether the antecedent article "a" in Amendment 79 designates "one" or "any."
[4] By contrast, Ark. Const. amend. § 79(d)(1)(A) expressly identifies as an event proscribing any increase in assessed value the "purchase" of property as a homestead by a disabled person or a person over the age of 65.
Although you have not inquired about the effect of a change in use of property, you note in your factual recitation that the legislation proposed by the assessors would completely lift a cap not only if a property owner sells the property, but also if he changes its use. Amendment 79 is likewise silent on the question of what will be the effect of a change of use.
[5] Having ventured this opinion, I feel obliged to note that the legislature, in addressing a roughly analogous situation, apparently felt the need to express what I have just characterized as "self-evident" by providing that the tax benefits afforded a disabled person or a person over the age of 65 will be unavailable to a purchaser who would not have qualified for the benefits himself. A.C.A. § 26-26-1120(b)(1).
[6] I infer from your factual recitation that assessors are currently not lifting the 10% and 5% caps on assessments when property changes hands. It is unclear whether any assessors have adopted a practice of adjusting the assessment if, upon conveyance, the use of the property changes from homestead to non-homestead or vice versa. In any event, it would not appear that assessors interpret Amendment 79 as obliging — or, for that matter, permitting — them to charge taxes on the full assessment following a conveyance of property.
[7] One might argue that the assessed value for purposes of taxation should be limited to 5% or 10% above the assessed value at the time of the sale — a formula that would accord with a reading of Amendment 79 treating the pertinent caps as applicable not to the status of theowner, but rather to the use of the parcel of property by the current owner in any particular tax year. However, Amendment 79 by no means dictates this formula. As noted in the text of this opinion, Amendment 79, §§ 1(b) and 1(c) are ambiguous regarding whether the 10% and 5% caps apply only to the owner at the time of a reappraisal that triggers a cap or to the parcel throughout any period between reappraisals. By contrast, the cap imposed in subsection (d) clearly hinges on the owner's status as a senior or a disabled person. Given this fact, logic suggests that when the owner sells the property to someone who does not individually qualify for the same tax benefit, no cap will apply until, possibly, the next reappraisal. Moreover, purely as a matter of tax equity, given that the assessed value of property owned by an individual who has been a senior or disabled for a considerable period of time might be far lower than it would otherwise be, it strikes me as eminently reasonable for the legislature to declare that a 10% or 5% cap on increased assessed value will not apply upon the sale of such property. Simply put, it makes sense that such property will be assessed at full market value pending the next reappraisal.